EMSIG MANUFACTURING COMPANY,
Plaintiff,

v.

MERIT PLASTICS, Brofman Machinery
Corp., and Jules Friedman,
Defendants.

No. 61 C 411.

United States District Court
E. D. New York.

Aug. 24, 1966.

Robert D. Spille, Mark T. Basseches, and John A. Mitchell, New York City (Curtis, Morris & Safford, New York City, of counsel), for plaintiff.

John T. Kelton, New York City, and Jerome Bauer, Mineola (Watson, Leavenworth, Kelton & Taggart, New York City, of counsel), for defendant.

## MEMORANDUM

DOOLING, District Judge.

Plaintiff has sued for infringement of its patent (Dangelmajer, U. S. Patent No. 2,643,983) on a composition of matter useful in compression molding of buttons and other articles in which a "mother-of-pearl" appearance of light reflected from depth ("integral sheen") is desired. It has been concluded that plaintiff's patent is invalid and that defendants' practice did not infringe. Separate findings of fact and conclusions of law have been made.

For many reasons, in the period since the start of World War II plastic buttons (and other articles) have supplemented and, indeed, in some considerable part displaced articles, such as "pearl buttons," historically made from natural shell. High polymer chemistry supplied the starting materials (usually polymerizable and often cross-linkable substances such as polyesters and styrene) from which buttons (and other articles) could be "compression molded"; that is, the starting material could be flowed into multi-cavitied molding dies and the dies pressed between the opposing heated platens of a molding press. For that molding procedure thermosetting polymerizable substances were valuable, that

is, substances that, under heat, pass through successive stages of increasing viscosity, gelation and, finally, hard-cure as their chain-form molecules lengthen, by addition or condensation linkages, and, by cross-linkage, form three dimensional molecular structures of great size.

A practical polymer chemistry and matching set of compression molding techniques for the large scale low cost manufacture of plastic buttons antedated Dangelmajer's invention. While Dangelmajer's patent discusses the chemistry of his starting mixture, his invention lies elsewhere. He specifies thermosetting unsaturated polyester resin mixed with an ethylenically unsaturated monomer (such as styrene), and the choice may well be excellent; there is no suggestion that Dangelmajer's choice of polymerizable substances, and of compression molding, was an inventive choice among the known useful materials and methods; the theory of the claim of patentable novelty is that plaintiff's invention deals effectively with a peculiar intractibility evinced by the known materials and methods: they did not acquire pearlescence readily.

Otherwise satisfactory plastic buttons (and other articles) did not automatically evince the integral sheen or "pearlescence" of "mother-of-pearl." They could be made clear or pigmented. To produce integral sheen or pearlescence, it had long been known, required the dispersion in depth through clear hardened plastic of tiny light-reflecting bodies the light-reflecting faces or facets of which would lie parallel with that surface of the button (or other article) which met the eye. One useful class of light-reflecting "lamellae" was fish scales (sold as "pearl essence"); if fish scale is perfectly oriented in, for example, a button, the button will have pearlesence, or integral sheen if its flat surfaces are viewed but, looked at from its edge, the same button will seem clear and colorless; the explanation is that if nearly all the flat fish scales are oriented with their flat sides parallel to the flat surfaces of the button, there are few or no lamellae to reflect

light to and through the edges of the buttons. If fish scales or other lamellae are randomly dispersed throughout the body of a plastic article, it is not pearlescent but whitish.

So much was known. It was known, too, or at least, it was assumed, that orienting lamellae was intimately related to "flow" in polymerizable materials (Paisseau, French patent No. 570,208 of 1924; Fields U. S. patent No. 2,168,331 of 1939; Clewell U. S. patent No. 2,265,226 of 1941; Gertzog U. S. patent No. 2,311,533 of 1943); Dangelmajer starts from the proposition that orientation could be secured by certain sorts of timely mechanical operations on the polymerizable mass (see his patent Col. 1, 1.52 to Col. 2, 1.5). Throughout the prosecution of his patent Dangelmajer reiterated to the Patent Office that he was eliminating resort to special mechanical procedures for getting the desired orientation of lamellae.

Dangelmajer's contribution can be summed up in one word with special emphasis on its first syllable: pre-polymerize. He discovered that if the thermosetting mixture was polymerized as near as possible to, but still short of, the point of gelation (yet remaining, although highly viscous, miscible with non-polymerized starting material) and then, and only then, was compression molded, pearlescent buttons were produced directly, without any mechanical manipulation or operation other than that inseparable from and implicit in the flow mechanics of conventional compression molding. The key claim of Dangelmajer's patent was on the mixture of the chosen thermosetting polymers with a polymerization catalyst and lamellae, "said mixture being in the range of maximum viscosity before gelation, but still homogeneously miscible with non-polymerized starting material." The quoted words are the critical ones, for they identify a state of the mixture as that which gives it its functionally novel quality. Claim 3 is on products made from the patented composition. Claim 2 (not here involved) is—essen-

tially—on the composition with an added polymerization inhibitor—to give the composition of Claim 1 "shelf life."

The basic claim, then, is on a familiar polymerizable mixture at a functionally critical point of polymerization. Compare, however, Application of Jones, 33 C.C.P.A. 1005, 154 F.2d 688, 1946. The precise point of the invention is that at that very point (or range) and only at that functionally critical point (or range) is the polymerizable mixture the long sought directly-moldable starting material for compression molding pearlescent buttons and other articles. Dangelmajer does not say that the perfect orientation will occur if the buttons are "cured" without heat and pressure; he does not say that the flow of the mix in the mold under the heavy, hot pressure of the press platens is not the very thing that causes the desired orientation; what Dangelmajer does say is that pearlescent material can be directly pressed out without doing anything more than simply compression-molding an otherwise proper mix if that mix is prepolymerized to the high range of viscosity that he describes. He is not concerned with the cause of the effect, with whether it is due to flow mechanics or arises from some mystery of high polymer molecular dimensionality; his concern is with the result, that it has certain reproducibility, great manufacturing advantages, and—as he contends—unobvious novelty.

Defendant Brofman in making its pearlescent buttons used a mixture that responds precisely to Dangelmajer's claim except that at the time defendant poured the mixture into its compression-molding dies, the mixture was not prepolymerized to a point just short of gelation. But defendants' molding dies were hot—as molding dies conventionally are. In the time it took to prepare the filled die for insertion in the press, and in the further time in the press preceding gelation and cure, the mixture of defendant necessarily polymerized to (and past) the maximum viscosity preceding gelation in which the mix remained miscible with non-polymerized starting material. Indeed, any thermosetting moldable plastic mixture necessarily does that. Hence, defendant argues, if defendant infringes, the claim must be invalid, since all compression molding of conventional thermosetting "plastic" mixtures would equally infringe. Defendant argues that even if "un-pre-polymerized" starting material were deliberately used as direct-molding material, the patent would nevertheless be infringed because in the molding die at some point of time the starting mixture inevitably becomes the precise composition of the patent. Hence, defendant concludes, either defendant does not infringe or the claim is invalid as embracing conventional uses of long known non-infringing materials.

A special difficulty of analysis here is in the form of Claim 1. The mixture is not a novel union of constituents but was familiar when Dangelmajer made his invention. It is the familiar mixture at a certain range of viscosity (and, therefore, of polymerization) that is claimed, and it is claimed "for" use in the particular process of "compression molding." Since it is true that every thermosetting mixture that is compression molded to a hard cure passes through the indicated viscosity range, the claim cannot be read that broadly. A pair of tests that Dangelmajer presented to the Patent Office establishes that. In one test the starting mix was polymerized to a very high viscosity, then cooled (with polymerization arrested) to room temperature and then compression molded in three minutes at about 248° F. to yield a perfectly pearlescent product. In a second test the same starting mix was directly compression molded in three minutes at the same molding temperature and no pearlescence resulted. Yet in the broadest sense both starting materials necessarily passed through the critical pre-gel stage.

Claim 1 must therefore be read in a sense that restricts it to the teaching of the patent, which is that the polymerization to the significant pre-gel

range of viscosity is a pre-polymerization, and is not simply a transitory stage in that polymerization which occurs during and as a part of the ordinary procedures of compression molding. "Pre" means, then, before entering on the steps properly integral to compression molding.

■ Claim 1 may seem to be converted into a process claim by such a reading, but the words of the claim, read against the specification and the file history, admit of the restricted meaning and do not genuinely support any broader reading. Cf. Graham v. John Deere Co., 1966, 383 U.S. 1, 33, 86 S.Ct. 684, 15 L.Ed.2d 545. If the claim is in essence a process claim, that may be an unimportant formal matter if, though cast as a product claim, it delimits the invention precisely. Cf. Risdon Iron and Locomotive Works v. Medart, 1895, 158 U.S. 68, 72–74, 15 S.Ct. 745, 39 L.Ed. 899.

The effect of the reading in the present case is necessarily to acquit defendant of infringement. The evidence does not support the interpretation that defendant departed from accepted compression molding techniques. Defendant used a ready-made liquid mixture of thermosetting, unsaturated liquid polyester resin with an unsaturated liquid compound having an ethylenic linkage (Laminac 4120); it added the polymerization catalyst recommended by the maker of the Laminac 4120; and it added pearl essence. It poured the mixture directly to heated molding dies, as is customary, and from that point to the closing of the press, about one and a half minutes later, three separate steps were quickly performed: the mix was rolled (or "combed") into the die cavities with a roller, the die was thrust into a vacuum chamber to de-bubble it, and then the die face was rolled again. After that the die was hand carried to a press, inserted, and the press was closed. The die stayed in the press (the platens of which were at 225° to 250° F.) for about two minutes. The defendant's procedure did not employ the pre-polymerized product of the patent, or covertly use prepolymerization in the sense of the patent by substituting an exaggerated residence time in the molding dies for an overt prepolymerization stage. Defendant's practice did not seem to vary in essentials from the molding practice plaintiff uses. Plaintiff, working with prepolymerized material, goes through the equivalent of a combing stage and then closes the press and cures the mix. Dangelmajer, in his specification, (Col. 3, 11.19–21) noted that, "If necessary, gas bubbles are removed by suction," after prepolymerization and before molding, indicating that it is an unremarkable practice.

The critical point is time. The starting material, used with the particular catalyst specified for it, and used to make relatively thin sections such as buttons, gels so quickly and cures so rapidly that it is somewhat difficult to see how to proceed in any other way than that which defendant used short of introducing a special step of arrested polymerization. To do that, and have a store of prepolymerized material at hand connotes a different production line from defendant's as evidently plaintiff's must be. The difference in the two methods, in the absence of evidence that defendant's method is a calculatedly covert use of the implied method of the patent, is the difference between practice under the patent and avoidance of it.

■ It is not that absence of a will to infringe or of consciousness of infringement can make a difference. It is rather that if Dangelmajer did not bring to the art as something new a directly moldable plastic mix that produced pearlescent articles on simple compression molding, he brought nothing. If the compression molding art as known produced pearlescent articles with an already known mixture and without any separable stage of prepolymerization, the art already had what Dangelmajer professed to bring to it. Defendant practiced only what was old. Analysis of his practice discloses necessarily that

the progress of polymerization is divisible between what precedes and what follows the state of maximum viscosity before gelation. The conclusion is not, however, that defendant infringes but that the claim is invalid if it embraces defendant's practice. The claim of the patent is self-destructive unless it delineates a product that has identity and industrial utility rather than seizes upon a transitory condition that must occur in any polymerization to ultimate cure of the basic constituents of the claimed composition.

The result is to disclose a more fundamental weakness of Claim 1. It becomes apparent that it does not mark an unobvious advance over the prior art notwithstanding that it is not identically disclosed in any earlier patent or publication. The known use of hot molding dies and quick curing polymers (see, e. g., Ellis, No. 2,255,313, p. 3, col. 2, 11.17–30, 50–53), taken with the general acceptance of the idea that flow-in-the-mold is significant in securing orientation of light reflecting lamellae (see, e. g., Gertzog, No. 2,311,533, p. 2, col. 1, 11.11–15, 41–48) requires the conclusion that the teaching of Dangelmajer, to the extent that it goes, was either actually known and practised in high-speed compression molding of buttons and other thin sections from such polyester resin mixtures as Laminac, or was in the grasp of persons having ordinary skill in the art. Dangelmajer's teaching is by its nature flexible and elusive, and when it comes into such close correspondence with preexisting practice as the present case discloses, the novelty of the invention dissolves, and it becomes a statement of a condition precedent to the occurrence of a certain effect and not a discovery of a new and unobvious method of (or product for) producing the effect. Dangelmajer's teaching, although it commits itself to no theory of the reason for the effect, is necessarily addressed (as defendant's experience shows) to known occurrences.

■ Plaintiff argues that patentability can attach to recognizing that functional advantages can be anchored to a feature already present but applied to a non-functional end in an article of manufacture, and to modifying the feature to capture the functional advantage (Georgia Pacific Corp. v. United States Plywood Corp., 2d Cir. 1959, 258 F.2d 124), and that under the classic principle of Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, cf. Tilghman v. Proctor, 1880, 102 U.S. 707, 711–712, 26 L.Ed. 279, a patentable invention may lie entirely within the boundaries of a known machine and its process and relate to a reordering of the operation of its parts that, unobviously, effects a radical change and improvement in its mode of action on its subject material and greatly increases productivity. Dangelmajer is not within the idea of the cases relied on. While Dangelmajer was certainly not required to expound a theory if he taught a workable practice, a fundamental difficulty with Dangelmajer's disclosure is that he neither adopts a theory, which would at once instruct the practitioner and delimit Dangelmajer's discovery, nor presents the practitioner with a firmly structured set of working rules that sharply differentiate Dangelmajer's procedure from the prior art and familiar molding practice.

For example, Gertzog's procedure (No. 2,311,533, at p. 2, col. 1, 11.41–48) involved "carrying out the * * * molding operation in such manner that the plastic composition is caused to flow in a direction parallel to the surface of the eventual article to be produced, thereby orienting a substantial portion of the * * * [lamellae] with their pinacoidal faces parallel to the surface." That procedure of Gertzog's appears from the evidence to be assured in compression molding, which ordinarily involves leaving an "excess" of mix on the molding die that is distributed over the die and pressed, in normal compression molding, to produce a "lateral flow." The Brofman ex-employees who had been in charge of the molding procedure for

defendant supposed that the second rolling or "combing" of the molding dies brought about the orientation of the lamellae; the partner in charge of plaintiff's molding operation attributed the orientation to lateral flow in the mold during compression molding after the press was closed; defendant's ex-employees agreed that in their compression molding they obtained flow in the mold as a desideratum; plaintiff's molder agreed that he too performed a distinct step of mechanically distributing the mix over the molding die before closing the press for curing.

Fields (No. 2,168,331), concerned with getting concentric orientation (for fountain pen barrels etc.), analyzes his result in terms of its being a flow phenomenon (see Fig. 5 and p. 2, col. 2, 11.20–31, 40–44). Clewell (No. 2,265,-226) uses centrifugal force to assure concentric orientation—for the same purposes as Fields; Clewell characterizes one effect (of distorted reflection) as resulting from calculated interference with "the line of orienting flow within the low viscosity material." Fields and Clewell, striving for what they evidently considered a difficult feat of orientation in rods and tubes, treat their orientation as parallel to the surface intended to be viewed; Fields and Clewell preferred use of partly polymerized starting materials because that reduced the molding time and tended to prevent mineral pigment from settling out.

Reardon (No. 2,078,808) appeared to consider that resins with a low acid number merely as such functioned to "level" aluminum and bronze "flakes" when such resins were used as thickeners and binders for "metallic" paint, and he also treated paradichlorobenzine (in additions of 0.5%) as a "levelling" agent. Reardon uses the term "level" to describe the arranging of metallic particles to be substantially level and in contact at their edges, so as to give an apparently continuous metallic surface.

Paisseau (French, No. 570,208), although in the vaguest terms, treats orientation of lamellae as produced by currents or "veins of outflow" in the mass, and treats compression molding as a suitable operation to achieve orientation. Paisseau considered, too, that orientation could be effected by powerfully compressing the surface of a solid, and that the stretching of sheets of plastic produced orientation parallel to the direction of stretching.

Muskat (No. 2,377,095) disclosed interruption of polymerization in order to secure fusible polymers for later cure by heat molding. Robie (No. 2,369,-689) disclosed the use of certain cross-linked polymers as a means of getting viscous thermosetting materials that would yield stable and homogeneous suspension of abrasive particles.

Dangelmajer, examined as a witness, did not disagree with the notion that flow imparted orientation and that flow in the mold was implicit in the squeezing out of "excess" in the course of normal compression molding. He was in agreement that polymerization would occur in the molding die and could compensate for a failure to prepolymerize to a point just short of gelation. It was his view that inadequate prepolymerization, if compensated for by further polymerization in the normal course of molding, was in the range of his patent.

Claim 1, read against the background of molding practice and the disclosures and assumptions of the prior art does not define subject matter so different from the prior art that it would not as a whole be obvious to a person skilled in the art of molding plastics. The art was familiar with an apparently satisfactory mechanics of orientation and was not committed to polymerizing in a closed press as distinguished from using partially polymerized starting materials. Dangelmajer adds nothing definably new and unobvious. The uncertain boundaries of his claim disclose that it lacks the conceptual clarity—whether of theory or practice or both—

that alone could divide it from the approximations and generalizations of the prior art and practice. Cf. United Carbon Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 236, 63 S.Ct. 165, 87 L.Ed. 232; LeRoy v. Tatham, 1852, 55 U.S. (14 How.) 156, 176–177, 14 L.Ed. 367. The general injunction of the claim—to delay compression molding until polymerization is nearly at the point of gelation—appears in essence not to be a new idea but an extreme form of the general idea that prepolymerization saves time in the press and supplies a body viscous enough to hold insolubles in suspense.

The invalidity of Claim 1 entails the invalidity of Claim 3 which is wholly dependent on Claim 1. Claim 2 is not in suit.

Judgment must, accordingly, be for defendant on infringement and on the invalidity of Claims 1 and 3.