**CONGOLEUM INDUSTRIES, INC.**

v.

**ARMSTRONG CORK COMPANY.**

**Civ. A. No. 41762.**

United States District Court,
E. D. Pennsylvania.

Feb. 23, 1972.

Drinker, Biddle & Reach, by Lewis H. Van Dusen, Jr., Patrick T. Ryan, Philadelphia, Pa., Brumbaugh, Graves, Donohue & Raymond, by Eben M. Graves, Allan H. Bonnell, Joseph D. Garon, Bradley B. Geist, New York City, Sullivan & Cromwell, by Robert MacCrate, Michael M. Maney, New York City, G. Scott Romney, Ralph M. Jerskey, Richard T. Laughlin, for Congoleum Industries, Inc.

Howson & Howson, by Dexter N. Shaw, Gordon S. Rogers, Philadelphia, Pa., Theodore L. Thomas, Barry E. Haverstick, George L. Herr, Lancaster, Pa., Morton, Bernard, Brown, Roberts & Sutherland, by W. Brown Morton, Jr., Malcolm L. Sutherland, Washington, D. C., for Armstrong Cork Co.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

HANNUM, District Judge.

Presently before the Court is an action for infringement of United States Letters Patent 3,293,094 and 3,293,108 (hereinafter the "'094 patent" and the "'108 patent", respectively). The '094 patent is entitled "TEXTURED FOAM PROCESSES" and the '108 patent is entitled "TEXTURED FOAM PRODUCTS". Both patents were granted on December 20, 1966 and were issued to plaintiff's predecessor, Congoleum-Nairn, Inc., as an assignee of the applicants R. Frank Nairn, Joseph C. Harkins, Jr., Frank E. Ehrenfeld, Jr., and Hilton Tarlow. After extensive hearings, and after careful examination and consideration of the exhibits and records admitted at trial, the Court makes the following:

### FINDINGS OF FACT

1. Plaintiff, Congoleum Industries, Inc., is a corporation organized and existing according to the laws of the State of Delaware. Plaintiff was substituted by stipulation of the parties for Congoleum-Nairn, Inc., the original plaintiff, its predecessor in interest in the patents in suit. Plaintiff is the owner, by assignment, of all the right, title and interest in and to the patents in suit.

2. Defendant, Armstrong Cork Company, is a corporation organized and existing under the laws of the State of Pennsylvania.

I *History of Patented Process*

3. The floor covering industry has traditionally been a design-style industry.

4. For at least the last fifty years, the register of colored design with embossed patterns (e. g., color design coinciding exactly with embossed design in repetitive fashion) has been of importance because of the visual accent provided thereby and the proven commercial demand for such products.

5. By the early part of the 1950's, techniques for producing cellular foam vinyl resin compositions by utilizing chemical blowing agents were developed. Congoleum and its competitors recognized the potential applicability of these techniques for surface coverings, particularly resilient floor coverings.

6. By at least the middle 1950's, techniques had been developed for producing foam vinyl resinous compositions by using chemical blowing agents, such as azodicarbonamide, and stabilizer-promoters for lowering the decomposition temperature of the azodicarbonamide relative to the temperature at which the azodicarbonamide would decompose by itself. Among such known stabilizer-promoters were zinc octoate and dibasic lead phosphite.

7. Because it was known that embossing would enhance sales appeal, research was directed to developing techniques for producing vinyl resinous composition having an embossed foam decorative layer. However, none of the embossing methods developed to accomplish such purposes were commercially successful.

8. In 1961, the management of plaintiff's predecessor desired to introduce new floor covering products to take advantage of the technology which had been developed in the foam vinyl field.

9. While it was recognized that embossed patterns in register with a colored design were desirable, the only practical methods recognized by the flooring industry as applicable to foam vinyl floor coverings for obtaining such patterns involved high costs and gave only limited effects. This caused Congoleum to introduce its early foam vinyl floor covering with a smooth unembossed surface.

10. In June 1962 and for several years thereafter, plaintiff manufactured and sold, as unembossed "Cushionflor", a decorative floor covering comprising a felt backing, a cellular foam layer, a printed decorative layer and a clear wear layer. The foam layer was formed from a plastisol including polyvinyl chloride resins, azodicarbonamide, and dibasic lead phosphite. In making the product, the felt base was coated with a plastisol and subjected to sufficient heat to gel the resin but insufficient to decompose the azodicarbonamide. Conventional printing inks comprising a mixture of a pigment and a resin binder blended with a vehicle were printed on the gelled plastisol by a rotogravure printing process in the form of a design, the inks were dried to remove the volatiles, and a clear coat in the form of an organosol was applied. Thereafter, the product was heated to fuse the resinous compositions and to decompose the azodicarbonamide to provide a structure with a cellular interlayer.

11. Following the introduction of flat Cushionflor in June 1962, research on embossing techniques applicable to foam vinyl floor coverings continued, with particular emphasis being given to mechanically embossing the "Cushionflor" product.

12. During a meeting on January 25, 1963, Frank Nairn suggested that a new approach to the problem of obtaining embossing would be to find a chemical which could be put in the ink which would cause embossing.

13. In January 1963, the chemical embossing proposal was referred to Congoleum's Research and Development Department for consideration. This approach was rejected by the Director of Research and Development after no one could conceive of how the chemical embossing could be accomplished.

14. Notwithstanding the rejection of chemical embossing by the Research and Development Department, members of the Manufacturing Department concluded that the idea merited investigation.

15. Joseph C. Harkins, Jr., plant manager of Congoleum's Marcus Hook plant, Hilton Tarlow, chief chemist at Marcus Hook, and Frank E. Ehrenfeld, a plant chemist assigned to Marcus Hook, acting in concert, planned a research program directed toward determining whether there were specific compounds and a method which could be employed to chemically emboss foam vinyl floor coverings.

16. This program led to the identification of several chemical compounds (subsequently termed inhibitors) which, when applied to the surface of a foamable vinyl resinous composition would retard the decomposition of the blowing agent during the heating operation.

17. The Congoleum Research and Development Department, after being advised of the fact that chemical embossing had been demonstrated to be workable, was requested to assist the Manufacturing Division in the identification of the best inhibitor for plant production. The subsequent testing program led to the discovery of additional chemical compounds which were suitable inhibiting agents for use in chemical embossing.

18. Congoleum conducted its first plant trial of chemical embossing on April 11, 1963. Hydroquinone was used as the inhibitor. It was included in one of the inks and printed on the surface of the gelled plastisol normally used to manufacture the flat Cushionflor product. Although the hydroquinone discolored the foam, embossed effects were produced in register with the printed design.

19. Thereafter, a series of plant trials were conducted, using different compounds as inhibitors, which trials ultimately led to the commercial production of plaintiff's chemically embossed products sold under the trademark of "New Dimension Cushionflor".

20. In these trials, a felt backing was coated with a plastisol including polyvinyl chloride resins, azodicarbonamide and dibasic lead phosphite. The coated backing was heated sufficiently to gel the plastisol but not to decompose the azodicarbonamide. Conventional printing inks comprising a mixture of a pigment and a resin binder blended with a vehicle were printed in selected areas on the gelled plastisol by a rotogravure process to provide a design. Additionally, at least one of the inks contained fumaric acid as an inhibitor. The inks were dried to remove the volatiles, and a clear coat in the form of an organosol was applied. Thereafter, the product was heated uniformly to fuse the resinous composition and to decompose the azodicarbonamide selectively to provide a structure with a cellular interlayer. The extent of heating was controlled as to time and temperature to produce depressed areas where the ink containing fumaric acid had been applied.

21. The manufacture for commercial sale of a product produced by the method described in the '094 patent was commenced on August 22, 1963, with the first sale of products which were so manufactured taking place in September of 1963.

22. The chemically embossed Cushionflor marketed by Congoleum enjoyed outstanding commercial success and had such a profound effect on the vinyl sheet floor covering market that the major producers were compelled to develop and market competitive chemically embossed products.

## II The Patents in Suit

23. On September 18, 1963, application Serial No. 309,738 (the " '738 application") was filed in the United States Patent Office naming Messrs. Nairn, Harkins, Tarlow and Ehrenfeld as inventors of certain "Textured Foam Products" and the methods for producing them disclosed therein.

24. The '094 patent was granted on application Serial No. 522,006 filed December 20, 1965, which was a continuation-in-part of said application Serial No. 309,738 filed September 18, 1963, and application Serial No. 377,023 filed June 22, 1964.

25. Application Serial No. 377,023 filed June 22, 1964, was a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

26. Application Serial No. 425,276, filed February 25, 1965, was a continuation-in-part of application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of the application Serial No. 309,738 filed September 18, 1963.

27. Application Serial No. 487,441, filed September 15, 1965, was a continuation-in-part of application Serial No. 435,276 filed February 25, 1965, and a continuation-in-part of application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

28. Application Serial No. 508,184, filed October 22, 1965, was a continuation-in-part of application Serial No. 487,441 filed September 15, 1965, a continuation-in-part of application Serial No. 435,276 filed February 25, 1965, a continuation-in-part of application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

29. Application Serial No. 522,006, filed December 20, 1965, was a continuation-in-part of application Serial No. 508,184 filed October 22, 1965, a continuation-in-part of application Serial No. 487,441 filed September 15, 1965, a continuation-in-part of application Serial No. 435,276 filed February 25, 1965, a continuation-in-part of application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

30. The '108 patent was granted on application Serial No. 508,185 filed October 22, 1965, which was a continuation-in-part of application Serial No. 309,738 filed September 18, 1963 and of application Serial No. 377,023 filed June 22, 1964.

31. Application Serial No. 435,289, filed February 25, 1965, was a continuation-in-part of application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

32. Application Serial No. 487,422, filed September 15, 1965, was a continuation-in-part of application Serial No. 435,289 filed February 25, 1965, a continuation-in-part of application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

33. Application Serial No. 508,185, filed October 22, 1962, was a continuation-in-part of application Serial No. 487,422 filed September 15, 1965, a continuation-in-part of application Serial No. 435,289 filed February 25, 1965, a continuation-in-part of Application Serial No. 377,023 filed June 22, 1964, and a continuation-in-part of application Serial No. 309,738 filed September 18, 1963.

34. The '738 application and the two patents in suit which ultimately derived from it describe a specific application of chemical embossing to foam vinyl products of the prior art. These prior art foam vinyl products, exemplified by Congoleum's unembossed Cushionflor, are disclosed as being manufactured by a process including the steps of:

(a) applying a layer of foamable resinous plastisol to a suitable base, the foamable resinous plastisol containing sufficient blowing agent that it will expand to the desired degree upon heating to the selected processing temperature;

(b) the foamable resinous plastisol is gelled by mild heating to form a printable surface without decomposing the blowing agent;

(c) inks to form a decorative design are applied to the surface of the gelled foamable plastisol, typically employing multistate rotogravure printing equipment;

(d) in order to impart wearing qualities to the finished product, the printed gel is covered with a second non-foamable vinyl material called a "wear layer";

(e) the entire product with its several layers is heated to a processing

temperature sufficient to fuse the vinyl resins and to cause the blowing agent in the foamable composition to decompose, releasing gas as small bubbles throughout the foamable interlayer. Plasticized polyvinyl chloride resins were normally used. Azodicarbonamide was the preferred blowing agent, since the stabilizers normally used for polyvinyl chloride formulations promoted the decomposition of azodicarbonamide, and therefore it decomposed at the normal processing temperature for such formulations.

35. The '738 application and the two patents in suit further disclose that minor amounts of metal salts are usually incorporated as stabilizers in the foamable composition to reduce degradation by heat and light. Vinyl chloride systems are not normally used without such a metal salt stabilizer. Such stabilizers can also exert an influence on the decomposition temperature of the blowing agent.

36. The '738 application and the two patents in suit further disclose that to chemically emboss such foam vinyl products an inhibitor is applied before the foaming step.

37. In the final heating step of the chemical embossing process of the patents in suit the uniform heating is controlled as to time and temperature so that more blowing agent is decomposed in a raised area than in an adjacent depressed area to produce an embossed product. The greater decomposition of the blowing agent causes the raised or uninhibited area to expand more than the depressed area during the final heating step because of the greater amount of gas liberated.

38. The chemical embossing results from the modification of the chemical reactions involved in the decomposition of the blowing agent by the interreaction between an inhibitor, printed on the surface of a foamable composition, and the blowing system employed in the said composition so that the blowing agent decomposes to a greater or lesser extent in those areas where the inhibitor is present than in areas in which the inhibitor is not present.

39. The effect which the inhibitor has on the blowing system as described in the patents in suit is there stated as substantially altering the temperature at which the blowing agent decomposes.

40. The finished chemically embossed floor covering products described in the patents in suit have the preferred construction of a felt base, a foam interlayer, a printed design, and a transparent vinyl surface layer.

41. Where an inhibitor has been applied which results in depressed areas, the cells of the foam layer below the depressed portion can be smaller than the cells of the foam layer in the other portions because of the reduced gas evolution caused by the inhibitor.

42. Because the depressed areas occur where the inhibitor has been printed, there can be perfect registration between the embossing and any pattern printed at the same time as the inhibitor is applied during the printing operation.

III *Validity of the Patents in Suit*

*Sufficiency of Disclosure*

43. An inhibitor, as used in the patents in suit, is an agent which alters the decomposition temperature of the blowing agent, or the combination of a blowing agent with an accelerator, in the area of a foamable resinous polymer composition above or below where it is deposited.

44. There is a great variety in the chemical compositions of blowing agents.

45. The type of compound used as an inhibitor may also vary widely.

46. A simple test is set forth in the patents to determine whether, under specific conditions of use, a given inhibitor is capable of substantially altering the temperature at which the blowing agent decomposes.

47. By utilizing the simple test set forth in the patents in suit, any person skilled in the art can determine a given

compound's usefulness as an inhibitor under the specific conditions of use.

48. The concept of "decomposition temperature of the blowing agent" is a relative one in practical foam vinyl technology and derives specific numerical values only when such relevant factors as the heating rate and the chemical and physical make-up of the total system are taken into account.

49. The concept of decomposition temperature of the blowing agent as used in the patents in suit was well known and was commonly used by those persons familiar with the art prior to its inclusion in the patents in suit.

50. As used in the patents in suit, the "decomposition temperature" is that range of temperature over which the blowing agent will provide a suitable amount of gas to achieve the desired end result in the system being used.

51. The concept of "substantially altering the decomposition temperature of the blowing agent" as used in the patents in suit means an alteration of the decomposition temperature of the blowing agent sufficient to cause enough embossing so that the process can be used to enhance the commercial saleability of a product.

*Statutory Bar to Certain Claims*

52. The identification of carbohydrates, by specific reference as "inhibitors", was first set forth in application Serial No. 487,441 filed September 15, 1965, and Serial No. 487,442 filed September 15, 1965. The identification of three sulphur containing compounds, by specific reference, as "inhibitors" was first set forth in application Serial No. 435,276 filed February 25, 1965 and Serial No. 435,289 filed February 25, 1965. Other sulphur containing compounds were first identified as "inhibitors" by specific reference in application Serial No. 487,441 filed September 15, 1965 and Serial No. 487,442 filed September 15, 1965. The identification of other compounds, including dibutyl tin maleate, by specific reference, as "inhibitors" was first set in application Serial No. 508,184 filed October 22, 1965 and Serial No. 508,185, filed October 22, 1965.

53. All of the specific inhibitors identified in continuation-in-part applications, as set forth in paragraph 52, can be readily identified as inhibitors by utilizing the simple test set forth in the patents.

54. The patents in suit each state that it was found that certain chelating agents will chelate metal accelerators and thereby remove them from the system.

55. With respect to the continuation-in-part applications from which the '094 patent was derived, the earliest filed application to discuss the mechanism of chelating agents as an explanation of how certain inhibitors functioned was application Serial No. 487,441 filed September 15, 1965.

56. With respect to the continuation-in-part applications from which the '108 patent was derived, the earliest filed application to discuss the mechanism of chelating agents as an explanation for how certain inhibitors functioned was application Serial No. 487,442 filed September 15, 1965.

57. The '738 application disclosed compounds for use as inhibitors which functioned by chelating the metal accelerator.

58. The patents in suit each state that the inhibitor can form a compound with the accelerator to prevent its availability to lower the decomposition temperature of the blowing agent, i. e., that the inhibitor can interfere with the action of the accelerator on the blowing agent.

59. The earliest filed continuation-in-part application from which the '094 patent is derived which specifically states that one of the ways in which some inhibitors function is to attack the accelerator for the blowing agent was application Serial No. 435,276 filed February 25, 1965.

60. The earliest filed continuation-in-part application from which the '108

patent is derived which specifically states that one of the ways in which some inhibitors function is to attack the accelerator for the blowing agent was application Serial No. 435,289 filed February 25, 1965.

61. Several of the compounds specifically listed in the '738 application as inhibitors functioned by interfering with the action of the accelerator on the blowing agent.

62. The patents in suit each state that in the specification and claims of the patents the designation "blowing agent" is intended to include not only blowing agent alone, but also "the combination of the blowing agent with an accelerator".

63. The earliest filed continuation-in-part application from which the '094 patent was derived which made specific reference to the combination of a blowing agent with an accelerator as being included within the term "blowing agent" as used in the patent was application Serial No. 435,276 filed February 25, 1965.

64. The earliest filed continuation-in-part application from which the '108 patent was derived which made specific reference to the combination of a blowing agent with an accelerator as being included within the term "blowing agent" as used in the patent was application Serial No. 435,289 filed on February 25, 1965.

65. It was well known in the prior art that azodicarbonamide, as a common blowing agent, must be used with an accelerator to function in a practical polyvinyl resin system. The use of the term "blowing agent" to also encompass the combination of blowing agent with an accelerator was fully supported by the literature at the time the original applications were filed.

*Anticipation*

66. The following patents were cited by defendant as establishing the scope and content of the prior art for the purpose of showing anticipation or obviousness of the patents in suit:

U. S. Patent 2,825,282 (Gergen)

U. S. Patent 2,920,977 (Adams)

U. S. Patent 2,918,702 (Wetterau)

U. S. Patent 3,276,904 (Palmer)

U. S. Patent 2,906,642 (Dennis)

67. The Gergen patent describes a method of forming an embossed product by preparing a layer of resinous composition containing a blowing agent uniformly distributed through the composition and heating to gel the composition without decomposing the blowing agent. Selected portions of the gelled foamable resinous composition are printed with a heat (radiant energy) absorptive ink while other selected portions are printed with a heat (radiant energy) reflective ink. The composition is then uniformly subjected to a high-intensity radiant heat source, as a result of which the product is selectively expanded according to the pattern of the absorptive or reflective ink applied thereto.

68. The process described in the Gergen patent does not include the alteration of the decomposition temperature of the blowing agent as disclosed in the patents in suit.

69. The Gergen patent does not disclose or suggest the subject matter of the patents in suit.

70. The Adams patent describes a process whereby foamable plastisols, containing varying amounts of blowing agent, are printed on separate areas of a supporting layer in the form of a design. Upon uniform heating an embossed effect is achieved by the differential foaming of the different portions of the design.

71. The Adams patent does not disclose the alteration of the decomposition temperature of the blowing agent through the use of an inhibitor as disclosed in the patents in suit.

72. The Adams patent does not disclose or suggest the subject matter of the patents in suit.

73. The Wetterau patent disclosed a process for producing a foamed vinyl flooring, one embodiment of which imparts a textured surface.

74. The Wetterau patent discloses a process whereby a decorative layer is placed on top of a gelled foamable plastisol. The decorative layer can be printed at a plurality of stations with inks containing a pigment and a vehicle therefore which is a solvent. Cyclohexanone, which is disclosed as a solvent in Wetterau, is also disclosed as an inhibitor in the patents in suit.

75. There is no relation between the use of cyclohexanone as a solvent and the embossed effects obtained in the Wesserau process.

76. The Wetterau patent does not disclose or suggest the subject matter of the patents in suit.

77. The Palmer patent discloses a process for producing a cellular foam product having a printed design extending vertically through the foam layer. The process comprises steps of printing a pattern on a backing material by any suitable printing method and coating the printed surface with a foamable plastisol composition which contains a plasticizer which is a solvent for the pigment printed on the backing material. Upon heating the composition, the pigment is caused to migrate upward throughout the thickness of the foamable layer.

78. One of the "bleeding pigments" listed in the Palmer patent is "para red", a compound which is also known as "p-nitrobenzeneazo-α-naphthol" and listed as an inhibitor in the patents in suit.

79. The use of para red in accordance with the formulations in the Palmer patent will not cause embossing in the finished product.

80. The Palmer patent does not disclose or suggest the subject matter of the patents in suit.

81. The Dennis patent discloses a process whereby a chemical applied to the surface of a polyurethane foam will control the permeability of the foam at the interface where it is attached to some other material. It does not disclose embossing nor does it relate to foamed vinyl products.

82. The Dennis patent does not disclose or suggest the subject matter of the patents in suit.

83. Also cited by defendant as establishing the scope and content of the prior art was the publication entitled, "Celogen–AZ", Compounding Research Report No. 38, Naugatuck Chemical Division, U. S. Rubber Co., Aug. 30, 1955.

84. The publication, "Celogen–AZ", Compounding Research Report No. 38, Naugatuck Chemical Division, U. S. Rubber Company does not disclose or suggest the subject matter of the patents in suit.

85. The unembossed Cushionflor product and the process by which it was produced does not disclose or suggest the subject matter of the patents in suit.

*Obviousness*

86. In addition to the reference hereinbefore cited, the following patents and publications were cited by defendant as establishing the level of ordinary skill in the pertinent prior art:

(1) U. S. Patent 2,964,799 (Roggi)

(2) U. S. Patent 3,197,423 (Ackerman)

(3) U. S. Patent 3,305,496 (Riley)

(4) U. S. Patent 2,746,940 (Cooper)

(5) U. S. Patent 2,943,949 (Petry)

(6) U. S. Patent 2,618,621 (Burt)

(7) "Vinyl Foaming Agents", by R. E. Morthert, et al., Modern Plastics Encyclopedia, September 1960, pp. 307, 310, 311, 314.

(8) "Formulating Chemically Blown Plastisol Foam", by D. Gordon Kline, Modern Plastics, October 1961, pp. 135–138, 141, 142, 145, 227.

(9) "New Blowing Agents for Foaming Plastics", by R. A. Reed, British Plastics, October 1960, pp. 468–472.

(10) "Free Blowing PVC with Azodicarbonamide", a condensed translation

from Kunstoffe, vol. 52, October 1962, pp. 624–629.

(11) Encyclopedia of Polymer Science and Technology, vol. 2, pp. 532–565, Interscience Publishers.

(12) "Pick the Right ABFA Foaming Agent", Lasman and Blackwood, Plastics Technology, September 1963, pp. 37–39.

87. The prior art relied on by defendant to establish the ordinary skill in the pertinent art does not disclose or suggest the subject matter of the patents in suit.

88. Prior to the inventions claimed in the patents in suit, while it was recognized that embossed patterns in register with a colored design were desirable, the only practical methods recognized by the flooring industry as applicable to foam vinyl floor coverings for obtaining such patterns involved a substantial capital investment and higher manufacturing costs while giving only limited effects without embossing in register.

89. Prior to the invention claimed in the patents in suit, those skilled in the art had not conceived of a chemical compound applied to the surface of a foamable gel which would migrate into the gel and alter the decomposition characteristics of the blowing agent even though extensive research had been conducted in an effort to find some commercially feasible method to emboss foamed vinyl products.

90. In spite of the long-recognized need and the concomitant search for a suitable way to produce embossing in register, the solution was not achieved until the making of the inventions claimed in the patents in suit.

91. After obtaining a sample of plaintiff's chemically embossed commercial product and thoroughly examining it, defendant's own research technicians who were skilled in the art were unable for some time thereafter to determine the process by which plaintiff achieved its chemically embossed result.

92. Defendant consulted outside experts skilled in the art in an attempt to discover the process by which plaintiff achieved chemical embossing.

93. After thoroughly examining plaintiff's product, these recognized experts were unable for some time thereafter to determine the process by which plaintiff achieved chemical embossing.

94. The invention was not obvious to one skilled in the art.

*Fraud on the Patent Office*

95. On February 25, 1965, United States Patent application Serial No. 435,142 was filed in the names of Leon B. Palmer and Leonard R. Berkan, both employees of plaintiff.

96. The invention claimed in the Palmer-Berkan application was the identification of the mechanism by which some inhibitors functioned. The disclosure was that some inhibitors may operate by means of chelating and set forth those chelating agents which were the best chelators, i. e., those with a chelate constant of $1 \times 10^4$.

97. On September 15, 1965, continuation-in-part applications Serial Nos. 487,441 and 487,442 were filed on behalf of Nairn, et al. These, and all subsequent applications, as well as the patents in suit, contain the statement: "It has been found that certain chelating agents will chelate metal accelerators and thereby remove them from the system."

98. Continuation-in-part application Serial Nos. 487,441 and 487,442, as well as all subsequent applications leading to the patents in suit, were accompanied by oaths executed by Nairn, et al. that they were the original inventors of the claims presented in those applications.

99. The United States Patent Office ruled that the broad claims of the original Nairn, et al. application encompassed the subject matter of the Palmer-Berkan claims.

100. The addition of the information that certain inhibitors act by means of the chelating mechanism did not expand the claims made in the original Nairn, et al. application Serial No. 309,738, but merely clarified one area of the claims.

101. Since the Nairn, et al. claims were not expanded by the additional information concerning chelating agents, the oaths filed by Nairn, et al. that they were the inventors of the claims covered by the patents in suit were not false.

## IV *Infringement*

*Defendant's Commercial Process and Product*

102. Upon the introduction of chemically embossed Cushionflor, Armstrong undertook to develop a competitive product. It introduced its first chemically embossed foam product under the trademark "Accotone" on or about November 1, 1966.

103. The first step in the manufacture of defendant's commercial chemically embossed foam products is to apply a layer of foamable vinyl chloride plastisol to a felt base. A blowing agent (azodicarbonimide) is uniformly distributed throughout the polyvinyl chloride resin. Additionally, the foamable plastisol contains a uniformly distributed stabilizer-accelerator (usually zinc octoate) and a polymerizable monomer (usually trimothlol propane trimethacrylate).

104. The foamable plastisol is then sufficiently heated to gel, or at least partially fuse it, but not sufficiently to decompose the blowing agent. The gelled layer is self-supporting.

105. A design pattern is then printed on the surface of the foamable gelled composition by an off-set rotogravure machine.

106. In those areas of the design where embossing is desired, the ink contains benzoyl peroxide. The remaining areas of the design are printed with ink which does not contain benzoyl peroxide.

107. A transparent nonfoamable thermoplastic vinyl resinous composition which does not contain a blowing agent is applied to cover the printed gelled foamable composition.

108. The entire laminate is then heated in commercial ovens to completely fuse the resinous composition and decompose sufficient blowing agent to form a foam vinyl product having the desired foam thickness. The finished product is cooled. These fusion and foaming ovens apply heat as uniformly as possible to the surfaces of the goods being processed. The final heating step of the defendant's process is controlled as to time and temperature.

109. There are depressed areas in the finished product which correspond to the areas where the benzoyl peroxide was applied.

110. The printed design of the defendant's commercial product is in register with the depressed areas.

111. The defendant's finished commercial products are cellular foam vinyl floor coverings having depressed areas. The products have a felt base, a foam interlayer, a printed design and a clear vinyl wear layer.

112. The foam interlayer of the defendant's commercial products contain undecomposed azodicarbonamide and thermal decomposition products thereof.

113. Azodicarbonamide is the primary chemical in defendant's process which liberates gas.

114. Benzoyl peroxide penetrates into the foamable layer where it is applied.

115. Benzoyl peroxide is at least partly soluble in at least one component of the foamable composition during the fusion process.

116. Upon application to the gelled sheet, benzoyl peroxide decomposes to form benzoic acid, an organic acid having two carboxyl groups.

117. The average size of the foam cells in the depressed area of defendant's commercial products is substantially smaller than the average size of the foam cells in the raised area.

118. During the defendant's commercial process, the monomer in the depressed areas of the product becomes a cross-linked polymer, as indicated by its insolubility in the solvent tetrahydrofuran.

119. The raised areas in defendant's commercial product is completely soluble in tetrahydrofuran.

120. Both raised and depressed areas of plaintiff's commercial products are soluble in tetrahydrofuran.

121. There is a significant difference in the residual azodicarbonimide found in the raised and depressed areas of defendant's commercial product.

122. There is a direct relationship between the amount of foam formed in the raised and depressed areas of defendant's commercial products and the amount of residual azodicarbonimide found in the raised and depressed areas of defendant's commercial products.

123. Some of the monomer in the raised areas of defendant's commercial products undergoes thermal polymerization, an exothermic reaction.

124. The amount of thermal polymerization, and consequently the amount of heat given off by the exotherm, is not sufficient to increase the temperature in the raised areas during defendant's commercial process to decompose the significantly more azodicarbonimide decomposed in the raised areas than the depressed areas.

125. The cross-linking of the polymer in the depressed area of defendant's commercial products causes a rheological change, or "stiffening", in the foamable composition.

126. The rheological change in the depressed area is not sufficient to physically restrict the foam from expanding during the defendant's commercial process.

127. The benzoyl peroxide, as used in the defendant's commercial process, or the decomposition products thereof, reacts with the blowing agent and alters the temperature at which at least some of the blowing agent decomposes.

128. The alteration of the decomposition temperature of the blowing agent in defendant's commercial process is sufficient to cause an embossed effect which will enhance the saleability of the defendant's commercial product.

129. Benzoyl peroxide, or the decomposition products thereof, as used in the defendant's commercial process, substantially alters the temperature at which at least some of the blowing agent will decompose, and is therefore an inhibitor within the meaning of the patents in suit.

130. The defendant's commercial process infringes claims 1, 2, 3, 5, 6, 7, 8, 9, 16, 21, 22, 26, 27, 28, 29, 30, 32, 55 and 62 of United States Patent 3,293,094.

131. The defendant's commercial products infringe claims 1, 2, 3, 4, 5, 6, 11, 15, 16, 17, 18, 20, 21, 25, 26, 28, 30, 33, 34 and 39 of United States Patent 3,293,108.

V *Willful and Wanton Infringement*

132. In May 1963, Armstrong instituted a research assignment for the purpose of developing a cushioned vinyl floor covering. The product was to have a clear wear coat through which rotogravure printed pattern effects could be seen. The cushioned effect was to be produced by a foam interlayer. Upon learning of plaintiff's embossed foamed vinyl flooring, Armstrong broadened the research assignment to include the development of methods for producing foamed vinyl flooring products which were embossed. Consideration was given to obtaining such embossing by both mechanical and chemical means.

133. In November of 1964, Jack H. Witman, a research chemist for Armstrong, proposed a chemical embossing method which would utilize a polymerizable monomer uniformly distributed throughout a foamable plastisol. A polymerization catalyst would be included in an ink to be selectively printed on the gelled plastisol sheet. According to this theory, during the final heating step the polymerization catalyst would induce polymerization and cross-linking of the monomer, and thereby cause a less elastic, or fluid, quality in those areas where the catalyst-containing ink had been printed. Embossing would result due to

the physical restriction of the foam in the polymerized and cross-linked area as compared to the area which was allowed to foam freely.

134. This theory was tested in late November 1964 using 1, 3-butylene glycol dimenthacrylate as the polymerizable monomer and benzoyl peroxide as the polymerization catalyst. An embossed product was obtained.

135. The Witman monomer/peroxide method was adopted by Armstrong as its commercial process for producing embossed foam vinyl flooring after several alternate methods were considered and discarded.

136. On May 11, 1965, United States patent application Serial No. 454,907, covering the monomer/peroxide (Witman) method was filed. This application was subsequently allowed and, on January 23, 1968, was issued as United States Patent No. 3,365,353.

137. Throughout the development of its competing chemically embossed floor covering, Armstrong sought to find a commercially feasible method for producing such a product which would not infringe on plaintiff's patents.

138. A continuing research program was dedicated to determining the mechanism by which the monomer/peroxide process worked, and to distinguishing it from the plaintiff's patented process.

139. Although a significant amount of research was undertaken, and a considerable amount of data recorded, many of the conclusions were subject to varying interpretations.

140. Based on the interpretation placed on the data by Armstrong's researchers, both inside and outside patent counsel were of the opinion that "a very strong and convincing argument for non-infringement would be available."

141. Armstrong initially, and continuously thereafter, has marketed its chemically embossed cushioned vinyl floor covering in the good faith belief that it was produced by the restriction mechanism of the Witman monomer/peroxide process alone, with no substantial alteration of the decomposition temperature of any blowing agent, and was therefore a non-infringing process and product.

142. Armstrong's infringement has not been willful and wanton.

## DISCUSSION

### I Validity of the Patents in Suit

Application Serial No. 309,738, which ultimately led to the issuance of the patents in suit, was filed with the United States Patent Office on September 18, 1963. Prior to that time, foamed vinyl products were well known and in frequent use. Plaintiff's own product, sold under the name of Cushionflor, is an example of the state of the art as it existed at the time.

In capsule form, foamed vinyl products produced prior to the inventions claimed in the patents in suit traditionally utilized an interlayer of polyvinyl chloride resin containing a "blowing agent", which when heated decomposes and releases gas, i. e., "blows", to create the foam layer. To obtain a blow at a temperature which will not char the surface of the product, the industry has utilized a metal salt in the foamable composition which serves a dual purpose. First, the presence of the metal salt lowers or accelerates the temperature at which the composition will blow, thereby avoiding the problem of charring. Second, the metal salt stabilizes the composition so as to prevent discoloration from heat and light while the final product is in use.

The actual process for producing the foamed vinyl product consisted of applying an emulsion composition consisting primarily of vinyl chloride resin, but also containing a blowing agent and a stabilizer-accelerator, to a felt base. These two layers were heated so that the emulsion composition, or plastisol, was converted to a gel with sufficient strength and consistency to have a colored ink pattern or design printed on its surface. The amount of heat necessary

to gel the plastisol was not sufficient to blow the blowing agent. The printed gel was then coated with a clear vinyl chloride film called a "wear layer" which would provide a durable surface on the finished product.

The entire composition was again heated, but at a temperature which was sufficiently high to fuse the vinyl resins and to cause the blowing agent in the foamable composition to decompose, or blow, releasing gas as small bubbles throughout the vinyl resin mass to create a soft foam intermediate layer. The resulting product was resilient when stepped on because of the foam layer, but was also wear-resistant because of the clear, strong wear layer on the surface.

The floor covering industry has traditionally been a design-style industry so, although the foamed vinyl floor covering provided a durable and attractive product, it was felt that an embossed surface would provide a visual accent and enhance sales appeal. Considerable research toward producing a suitably embossed product was therefore undertaken by the industry. The goal was to find a commercially feasible method for obtaining an embossed surface with the embossing occurring in exact register with the printed design.

The fruits of the plaintiff's research program evolved into the process claimed in the patents in suit. It was found that certain chemical compounds would penetrate into the gelled plastisol and alter the decomposition temperature of the blowing agent and stabilizer-accelerator. This compound could be carried in the colored ink which was printed on the surface in the form of a design. The chemical, known in the patents as an inhibitor, could be included in selected inks, while the remaining areas of the gel were printed with conventional ink without the inhibitor. During the subsequent heating process, the blowing agent in the area of the gel not treated with an inhibitor ink will decompose, or blow, to convert that gel into foam at the normal oven temperature. At the same oven temperature, however, the areas printed with an inhibitor ink will not foam because the decomposition temperature of the accelerated blowing agent has been raised by the inhibitor and its higher decomposition temperature is not reached during the normal oven heating. The difference in the amount of foam formed between the inhibited and uninhibited areas results in a surface which is partially raised and partially depressed. The depressed areas are formed in exact register with those selected portions of the printed design which are intended to be depressed and the raised areas are likewise in exact register with those areas of the design intended to be raised. The final floor product is embossed, and the process permits a wide variety of color, design and three-dimensional effects. The process also had the advantage of being a simple, low cost operation which could utilize the existing equipment.

After the initial success of plaintiff's research, further investigation revealed that other inhibitors were available which were suitable for use in the printing ink to obtain embossing. The suitability of any particular compound for use as an inhibitor was found to depend on a number of factors, including the particular blowing agent utilized in the system, the stabilizer and plasticizer in the composition and the fusion and decomposition temperature of the resin. A simple test was therefore devised so that the effectiveness of any given compound as an inhibitor could be determined under a given set of conditions and at varying concentrations in the ink. A great many compounds were found, under varying conditions, to be suitable inhibitors.

*Anticipation*

Defendant has raised the defense that plaintiff's patents are invalid since they were anticipated by the prior art. In this regard, a number of prior patents and publications were cited.

One of the prior art references cited in support of its position is United States Patent 2,825,282 (Gergen). Ger-

gen discloses a process whereby embossing is achieved in a foam vinyl product by printing selected areas of the surface of the unblown plastisol sheet with a carbon pigment ink. The sheet is then uniformly exposed to an intense radiant energy source, but only for a long enough time to allow the carbon ink to absorb sufficient heat to decompose the blowing agent in the printed portion of the sheet but not for a long enough time to allow the blowing agent to reach its decomposition temperature in the unprinted portions of the sheet. The result, although at times similar to that obtained by plaintiff's process, is accomplished by a different means. Gergen does not selectively alter the decomposition temperature of the blowing agent but selectively controls the application of heat to specific areas.

The Adams patent, U. S. Patent 2,920,-977 achieves an embossed effect by printing foamable plastisols containing varying amounts of blowing agent on separate areas of a supporting layer in the form of a design. The uniform application of heat will result in an embossed effect because of the differential foaming of the different areas of the design. There is no disclosure, however, of a means to achieve embossing by printing on the surface of the gelled sheet a substance which will penetrate into the sheet and react with the blowing agent to selectively alter its decomposition temperature.

U. S. Patent 2,918,702 (Wetterau) discloses a process for producing a textured surface product, and is cited by defendant because cyclohexanone, which is listed as an inhibitor in the patents in suit, is also disclosed as a solvent to be used as a vehicle for the pigments printed on the surface of the Wetterau product. Although the textured effect produced by the Wetterau process has no relation to the use of cyclohexanone as a solvent, defendant suggests that embossed effects could be achieved if cyclohexanone were used as the vehicle for some pigments while another solvent were used as a vehicle for other pigments. There is no

basis, however, for assuming that different solvents, or different concentrations of the same solvent, would be used in the Wetterau process to achieve the suggested result.

Defendant next cites U. S. Patent 3,-276,904 (Palmer) which discloses a process for producing a cellular foam product having a printed design extending vertically through the foam layer. The pigments which form the design are printed on a web backing which is then coated with a foamable plastisol containing a solvent for the pigments. The patent discloses a process whereby the pigments will bleed vertically from the backing through the plastisol composition to the upper surface. One of the "bleeding pigments" which is listed as suitable for use in the process is "para red", which is also disclosed as an inhibitor in the patents in suit. Defendant suggests that, by using para red in the Palmer patent, embossed effects could be achieved. However, Palmer does not disclose a method for producing an embossed effect, and there was no evidence which indicated that embossing would be obtained within the framework of the Palmer patent without the knowledge of the disclosures of the patents in suit.

Finally, defendant cites U. S. Patent 2,906,642 (Dennis), a patent which discloses a process for applying a chemical to the surface of a foamable composition which inhibits the foaming thereof so as to control the permeability of the resulting foam. The process is not directed toward chemical embossing and cannot, therefore, anticipate the patents in suit.

Neither plaintiff's commercial production of unembossed Cushionflor nor the cited Naugatuck Chemical Division, U. S. Rubber Co. research report, "Celogen–AZ," in any way relate to a chemically embossed product nor a method for obtaining such a product.

■■ The foregoing references have been cited by defendant in support of its claim that the patents were anticipated and therefore invalid pursuant to 35 U.

S.C. §§ 102(a) and (e). Anticipation is a technical defense which must be strictly construed. The language of 35 U.S.C. § 103 indicates that 35 U.S.C. § 102 can be used to prevent patentability only where the invention is "identically disclosed" by the prior art. Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263 (2d Cir. 1967). The test for determining if a claim of a patent has been anticipated by a prior reference is whether that reference contains, within its four corners, adequate directions for the practice of the patent claim sought to be invalidated. Dewey & Almy Chemical Co. v. Mimex Co., Inc., 124 F.2d 986 (2d Cir. 1942). The specifications of the cited prior reference must disclose, in substance, the same knowledge and the same directions as the specifications of the patents in suit. Skelly Oil Co. v. Universal Oil Products Co., 31 F.2d 427 (3d Cir. 1929). In broad language, it may initially be said that a process or product which would infringe if later than the disputed patent, anticipates if earlier. Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912 (3d Cir. 1966); Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3d Cir. 1962).

The court has little difficulty in determining that the prior references cited by defendant do not identically disclose the claims of the patents in suit. None of the prior references impart sufficient knowledge so that one skilled in the art would know that embossing could be obtained by means of an inhibitor which, when printed on a gelled plastisol sheet containing a uniformly distributed blowing agent, would penetrate into the gel and substantially alter the temperature at which the blowing agent decomposes. Furthermore, it is not sufficient to constitute an anticipation that the reference relied upon discloses a process which might, by slight modification, be made to perform the function of the patented process. Therefore, although defendant speculates that embossing could have been obtained by the identical means disclosed in the patented process had certain elements been properly formulated in both the Wetterau and Palmer processes, it is clear that one skilled in the art could not have known how to use cyclohexanone or para red to obtain embossing in the respective processes without knowledge of the disclosures of the patents in suit. Simply because all the ingredients were present does not mean that they would have been used in the proper proportions nor heated to the proper temperature for the proper length of time. Defendant has fallen far short of presenting clear and convincing proof that the patented process and products were previously described or so used as to be unpatentable pursuant to 35 U.S.C. §§ 102(a) and (e).

*Obviousness*

Even if the subject matter of a patent is not identically disclosed so as to be unpatentable under 35 U.S.C. § 102, the subject matter may be unpatentable over the prior art under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art.

The general level of the prior art has been previously discussed. Foamed vinyl products produced by heating a composition containing a blowing agent and an accelerator so as to decompose the blowing agent and thereby release gas within the plastisol were well known. Techniques had been developed for producing a random texturing of the surface of these products. The search for methods to obtain embossing in conjunction with a printed design had resulted in the development of several mechanical systems as, for example, the use of a hot pattern roll, as well as methods which utilized differently foamable plastisols printed in different areas of the design. Although the Gergen process, previously discussed, discloses a method for obtaining embossing in conjunction with a printed pattern, it functioned by selectively con-

trolling the application of heat to the foamable composition. Thus, the difference between the methods cited in the prior art and the process claimed in the patents in suit is that the plaintiff utilized a chemical process in which a compound known as an inhibitor, selectively printed on a uniform substrate, alters the temperature at which the blowing agent will decompose. This concept is novel and not within the scope of the prior art. It is also clear from the evidence adduced at trial that one ordinarily skilled in the art and aware and mindful of the prior art's teachings would not have realized that embossing could be obtained by altering the decomposition temperature of the blowing agent by employing a chemical compound such as what has come to be known as an inhibitor. Evidence from several sources indicates that those who were skilled in the pertinent art did not believe that there was a substance which, in the small quantity which could be printed on the surface of the gelled sheet, and which could thereafter penetrate into the gel, would be sufficient to significantly affect the decomposition temperature of the blowing agent.

■■■ There are additional considerations which corroborate this conclusion. These secondary considerations may be utilized to shed additional light on the circumstances surrounding the origin of the subject matter of the patents in suit, and the level or ordinary skill in the pertinent art. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). There was clear evidence that the floor covering industry, in light of its traditional design-style orientation, had long felt that a product which could be embossed in exact register with a printed design would be extremely desirable because of its potential to enhance the appearance of their products. The evidence is also clear that, despite this long felt need, no one came up with a commercially successful process and product until the inventions covered by the patents in suit. Nonobviousness is further underscored by the fact that when requested to develop or determine

the feasibility of the original idea, plaintiff's own Research and Development Department rejected the idea as unworkable. Likewise, even after plaintiff's product became commercially available, defendant's research chemists and other independent experts consulted by defendant were unable to ascertain with certainty how plaintiff's embossing was achieved. Where experts in the pertinent art are unable to perceive how the embossing was achieved, even after examining the product, an inference of nonobviousness is certainly justifiable. Jones Knitting Corp. v. Morgan, 361 F. 2d 451 (3d Cir. 1966). Finally, the court notes that it is stipulated that the plaintiff's chemically embossed products have enjoyed outstanding commercial success.

The relevance of these secondary considerations as indicia of nonobviousness has been frequently acknowledged. Such indicia are here recognized as cumulative and conclusive evidence that the patented process is a clear advancement over the prior art. The issue of obviousness cannot be resolved on the basis of hindsight, declaring an invention obvious when it was not obvious to persons skilled in the art until someone pointed it out. Defendant's position is founded solely on tortured interpretations of the teachings of the prior art. The evidence has established that the invention constituted a material advance over the prior art by a method which would not have been obvious to one skilled in the art. As such, 35 U.S.C. § 103 is no bar to patentability.

*The Named Inventors*

Defendant has next raised the defense that the patents should be declared invalid because the named applicants for the patents in suit included persons not properly considered inventors of the claimed subject matter and omitted other persons known to have made prior suggestions of the same order as those included.

It is fundamental that only the true inventor or inventors may obtain a patent. 35 U.S.C. §§ 101, 102(f) and 115. In this regard, defendant specifically

contends that if Nairn and Harkins are properly included as joint inventors, the omission of Raymond A. Hill cannot be justified. Additionally, defendant urges that Ehrenfeld had an independent conception and first reduced it to practice, and is therefore legally entitled to be the sole inventor, if anyone is an inventor.

The credible evidence produced at trial established that on January 25, 1963, at one of plaintiff's monthly technical meetings, Frank Nairn suggested an idea for obtaining chemical embossing by putting some chemical into the ink that would act upon the blowing agent to prevent it from blowing. This chemical could be placed in the ink and printed directly onto the sheet in those areas of the design which were to be depressed. When the sheet is blown, those areas that were printed with the ink containing the chemical would remain depressed.

After the meeting, Nairn requested plaintiff's Director of Research and Development to discuss the feasibility of his suggestion with the members of his department. At plaintiff's technical meeting on March 1, 1963, the report from the Research and Development Department was that, although the idea received much attention and discussion, it was their considered opinion that the idea was not feasible. They requested not to be assigned to undertake any project in connection with it.

Joseph Harkins, who was Manager of plaintiff's Marcus Hook plant, determined to have the project undertaken independently of the Research and Development Department at his plant. He subsequently conferred with Hilton Tarlow, the Marcus Hook works chemist, and, together, they spent considerable time deciding how they were going to approach the project. Frank Ehrenfeld, a senior chemist at Marcus Hook, was called upon for assistance and ideas in connection with the project. Working as a team, the three decided upon the method of approaching the project to minimize the delay and improve their chances of successfully finding a suitable reagent. Ehrenfeld was assigned to conduct the laboratory experiments, while both Harkins and Tarlow followed the results of the laboratory tests and the extent of progress on a daily basis. Success came on March 20, 1963, when certain chemical reagents were found that would inhibit foaming in the specific areas where applied, thereby giving an embossed effect to the finished product.

The defendant's position that Raymond Hill is entitled to be named as a joint inventor stems from his testimony that chemical embossing was his idea. He testified that he introduced the subject at a meeting on January 22, 1963. His testimony that he originally conceived a chemical embossing process is further corroborated by a note which he claims was written in approximately September 1962 wherein he suggested that a way to obtain embossing would be to print some substance which would prevent the gel from foaming. This note was addressed to Tarlow whose testimony, introduced at trial by defendant, was that the only suggestion made by Hill was directed to a mechanical method for embossing. Testimony of other witnesses present at the January 22, 1963 meeting indicated that Hill did not mention chemical embossing at that time.

In resolving the conflicting testimony, the court notes that Hill's recollection of his participation in the conception and reduction to practice of the invention stands uncorroborated by any other witness. At the same time, the roles of each of the named inventors, although varying in some details, are substantiated by the testimony of several persons who were intimately involved with following the project from its inception to the ultimate introduction of the commercial product to the public. In view of the fact that there were numerous meetings occurring at which the development of the commercial process was discussed during these initial stages, it is not unreasonable to expect that Hill's recollection of the events occurring nine years previously is in error.

██ The granting of a patent raises a *prima facie* presumption that the named persons were the inventors of the patented process. The presumption may be rebutted by defendant only by showing that there was an improper misjoinder or nonjoinder of inventors by strong, clear and convincing evidence. Porter-Cable Machine Co. v. Black and Decker Mfg. Co., 274 F.Supp. 905, 913 (D.Md. 1967), aff'd 402 F.2d 517 (4th Cir. 1968), cert. denied, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969). After careful consideration of the testimony and exhibits, the inescapable conclusion is that without the participation and essential contributions of each of the named joint inventors, the invention embodied in the patents in suit would not have resulted. Nairn, Harkins, Ehrenfeld and Tarlow, acting in concert, were in fact the original inventors of the patented process and products. The defendant has failed to produce any clear and convincing evidence to the contrary.

*Sufficiency of Disclosure*

██ The validity of the patents in suit is next challenged on the basis of alleged insufficiency of the disclosures. The written specifications of the patented invention, and the process for making it, must be in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use that invention. 35 U.S.C. § 112. The purpose of this requirement of precise delineation of the scope of the invention is twofold. The claimed invention must be sufficiently described so that " . . . those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention." Jones Knitting Corp. v. Morgan, 361 F.2d 451, 454 (3d Cir. 1966). At the same time, the determination of sufficiency must depend on the nature of the invention claimed. The patent statute contemplates the protection of bona fide inventions, whether or not those inventions are capable of precise definition. Since inventions are not always capable of descriptions in terms of exact measurements, symbols and formulas, if the claims, when read in light of the specifications, reasonably inform those skilled in the art of both the use and scope of the invention, and if the delineation is as precise as the subject matter will permit, the requirement of specificity will be satisfied. Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958).

██ Defendant argues that the term "inhibitor" as used in the claims of the patents in suit is so vague and indefinite as to be meaningless, and it is impossible to determine from the patents whether a compound not named in the patent is or is not an inhibitor. An inhibitor is defined in the patents in suit as an agent which alters the decomposition temperature of the blowing agent in the area of the foamable composition above or below where it is deposited.

After the initial discovery of a compound which would alter the decomposition temperature of the blowing agent and thereby provide a chemical means for obtaining embossing, a great many other compounds were discovered which could be utilized in the same manner. When the application for the patents in suit was prepared, obvious physical limitations precluded listing every conceivable inhibitor. The application therefore includes an extensive list of inhibitors, but it is clear that the list is not intended to be exhaustive. However, the specifications further set forth a "simple test" by which the usefulness of any particular compound as an inhibitor may be determined. Therefore, where an unlisted compound is considered for use as an inhibitor, it should be checked by the simple test. In this manner it can be ascertained whether a compound, even if not specifically listed in the patents, is an inhibitor within the meaning of the patents in suit. It is therefore clear that a person skilled in the art can combine the written definition and the simple

test found in the patents to form a composite specification which is sufficiently clear so that it may be established whether any given compound is an inhibitor. Because of the physical limitations on listing every conceivable inhibitor, these specifications are sufficiently clear and concise to satisfy the disclosure requirements of the statute.

Defendant also claims that the concept of "decomposition temperature" of the blowing agent, the understanding of which is critical to the understanding of the claimed invention, is ambiguous and capable of several meanings. Several illustrative examples of possible meanings which can be ascribed to the concept of "decomposition temperature", as claimed by defendant, are:

1. The lowest temperature at which the blowing agent decomposes to evolve a gas;

2. The lowest temperature at which a measurable rate of gas evolution takes place in some particular measuring system;

3. The lowest temperature at which the blowing agent decomposes to evolve a gas, and, if the blowing agent is held at such temperature, will result in complete decomposition thereof;

4. The lowest temperature at which sufficient gas is evolved in a time period sufficient to produce a foamed product;

5. The temperature represented by the intersection of a line tangent to a base line and a line tangent to some part of the rate of gas evolution curve produced by a prescribed heating mode; and,

6. The temperature range in which maximum gas evolution take place as defined by the flat portion of the curves obtained by plotting gas evolved vs. temperature.

These possible definitions of the concept of "decomposition temperature" are recited here simply to demonstrate the length to which defendant has reached to manufacture an issue. The issue is wholly without foundation. As the defendant rightly states, the concept of "decomposition temperature" is a relative and pragmatic one in practical foam vinyl technology and derives specific numerical values only when such relevant factors as heating rate, type and location of measuring instruments and the chemical and physical makeup of the total system are taken into account. It is clear, from the literature, and even from the testimony of defendant's own experts, that one skilled in the art would be familiar with the concept and the manner in which it was intended to be applied. Defendant's expert, Dr. Zentmyer, testified that:

" . . . 'decomposition temperature' does not refer to a single degree Fahrenheit or degree Centigrade setting but rather from a very pragmatic point of view refers to a range of temperature over which the blowing agent will provide a suitable amount of gas to achieve the end result in the product desired and in the system that is being used."

When this definition, which is recognized and accepted by those skilled in the art, is utilized, the concept of "decomposition temperature" is sufficiently clear and concise to meet the standards required by the statute.

*Statutory Bar*

Defendant's next contention is that the patents should be declared invalid because the scope of the claimed invention was impermissibly expanded more than one year after plaintiff's own public use and sale. Title 35 U.S.C. § 102(b) provides that a patent may not issue if the invention was in public use or on sale in this country more than one year prior to the date of the application. Therefore, plaintiff cannot add a claim or enlarge the scope of what is originally claimed after the patented process or product had been available to the public for one year. However, pursuant to 35 U.S.C. § 120, a subsequently filed application is entitled to the filing date of an earlier application if: (1) the same invention is disclosed in the earlier application in the manner provided in

the first paragraph of 35 U.S.C. § 112; (2) the inventor is the same; (3) the application is filed before the patenting, abandonment or termination of the first application; and, (4) the application contains a specific reference to the earlier filed application. Technicon Instruments Corp. v. Coleman Instruments Corp., 385 F.2d 391 (7th Cir. 1967). Thus, the first inquiry must be to determine whether the claims of the patents in suit are supported by disclosures in the original application which meet the standards of section 112. If there is sufficient disclosure in the first application to support the claims in the subsequent applications occurring more than one year after the public use or sale of the invention, then the subsequent claims are entitled to the benefit of the filing date of the first application. If the claims are entitled to the benefit of the earlier filing date, there obviously will be no statutory bar.

 Defendant's first claim is that the term "inhibitor", as used in the claims of the patents in suit, was enlarged by the addition of unrelated species and classes of inhibitors more than one year subsequent to the time plaintiff first began the manufacture and sale of products produced according to the patents. Specifically, it was disclosed that members of certain classes of compounds, including carbohydrates, sulphur containing compounds, and isocyanates were suitable inhibitors in continuation-in-part applications filed more than a year after the invention's first public use or sale. In order to avoid the statutory bar, the basis for each of these claimed inhibitors must be disclosed in the parent application ('738) or application Serial No. 372,023 which was also filed within the first year after public use of the process commenced. The original applications included a broad generic claim covering all inhibitors that might be used in the invention along with a simple test to determine how to find them. In previous discussion, it has been determined that this manner of description was sufficient to allow anyone skilled in the art to determine exactly what was being claimed. Therefore, the disclosure of additional classes of compounds which were suitable inhibitors do not constitute an impermissible broadening of what is claimed if they can be found by utilizing the simple test. This being the case, the testing of additional classes of inhibitors did not add to the claims, but simply provided additional information about specific compounds which would fall within the original disclosures. Testing to determine additional embodiments of the invention not expressly disclosed in the original specifications is not improper, especially where, as here, the application itself sets forth the tests to be employed. Jones Knitting Corp. v. Morgan, 361 F.2d 451 (3d Cir. 1966); Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir. 1968). The listing of specific compounds which were covered by the broad generic claims of the original applications was not an impermissible enlargement of the scope of the claims. The disclosures of the specific classes of compounds are therefore entitled to the benefit of the filing date of the first application.

Defendant's second attack on specific disclosures is that the earliest filed application which states that certain chelating agents will chelate metal accelerators and thereby remove them from the system was not filed until more than one year subsequent to the initial public sale or use of the invention. At the outset, it should be noted that certain compounds which are chelating agents were specifically disclosed as inhibitors in the original application. For example, citric acid, barbituric acid, and acetoacetanisidide are recognized chelating agents which were disclosed as inhibitors in the '738 application. The real question, then, is whether the inclusion of the subsequently determined manner in which a certain class of inhibitors functions constitutes an impermissible broadening of the scope of the original claims.

 It is clear that patentability is not barred by the failure of the inventors to understand the scientific prin-

ciple or mechanism on which the claimed invention is based, so long as the method and operative result of the invention are correctly described. Intermountain Research & Eng. Co. v. Hercules, Inc., 406 F.2d 133 (9th Cir. 1969); Electric Storage Battery Co. v. Shimadzu, 123 F.2d 890 (3d Cir. 1941). Since specific chelating agents had been disclosed as inhibitors in the original application, and since the suitability of other chelating agents as inhibitors could be determined by employing the simple test set forth in the patent, the critical information was already disclosed by the original application. The availability as an inhibitor of any chelating agent as well as any other compound, which fit the composite definition of an inhibitor as used in the patents in suit, is fully supported by the claims in the parent application. Since that conforms with the requirements of section 120, the disclosure of those additional inhibitors is entitled to the benefit of the earlier filing date. The invention concerns the use of inhibitors, including chelators, and is not dependent on the disclosure of the specific scientific mechanism by which those inhibitors act to alter the decomposition temperature of the blowing agent. The inclusion of explanatory information, therefore, does not expand the scope of the claims.

 The patents in suit disclose that the inhibitor can form a compound with the particular accelerator utilized to prevent its availability to lower the decomposition temperature of the blowing agent. However, neither of the applications filed within one year after the invention's first public sale or use include the information that the inhibitor can operate by interfering with the action of the accelerator on the blowing agent. Defendant argues that the claims have been impermissibly broadened because they are not limited to inhibitors which act on just the blowing agent as opposed to inhibitors which may function by reacting with the accelerator for the blowing agent. This point merely raises in general terms the point which was previously raised with particular reference to

chelating agents. Chelating agents act on the accelerator rather than the blowing agent. Other inhibitors listed in the original application also acted on the accelerator rather than the blowing agent, although not by the same chelating mechanism. As has been previously discussed, it is not necessary that the inventors understand the reasons why their inventions work as long as the invention is disclosed sufficiently to enable any person skilled in the art to make and use the same. The subsequently added explanatory information merely indicates how an inhibitor may operate to alter the decomposition temperature of the blowing agent. The mechanism of interfering with the action of the accelerator was not understood at the time the original applications were filed, but that lack of knowledge is of no consequence since it does not fatally flaw the specifications of the claims of the invention. They are still sufficient to meet the requirements of section 112. Furthermore, the claims as originally drafted, disclosed inhibitors which acted on the accelerator and therefore support the continued inclusion of such inhibitors in the patents in suit. The addition of the explanation of how certain inhibitors work provided the public with a fuller disclosure, but did not expand the claims, since the claims already covered such inhibitors.

 Finally, the defendant argues that the claims in the patents were impermissibly enlarged since the designation "blowing agent", as used in the original applications, was subsequently broadened to include "the combination of the blowing agent with the accelerator" in addition to just the blowing agent itself. Defendant's position is that since the operative, independent claims of the original applications are couched in terms of "substantially altering the decomposition temperature of the blowing agent", those claims and all claims dependent on them exclude a process in which the inhibitor reacts with an accelerator, leaving the decomposition temperature of the blowing agent itself un-

affected. The argument is closely related to the preceding one.

The critical question for our determination is whether the disclosures of the original patent applications were sufficient to enable a person skilled in the art to make a product using a process which utilized an inhibitor which acted on the combination of blowing agent and accelerator rather than on just the blowing agent itself. In light of the disclosures of the entire parent application and the prior art, we find no difficulty in answering the question affirmatively. The suggestion that the claims of the original application should be read to exclude any process where an inhibitor reacts with an accelerator, leaving the decomposition temperature of the blowing agent itself unchanged, ignores the known physical facts. There is no such process since it is not possible to affect the accelerator without also changing the decomposition temperature of the blowing agent. The important factor is that in the foamable composition, the decomposition temperature of the blowing agent is solely dependent on the combination of accelerator and blowing agent. Anything that affects the decomposition temperature of the blowing agent must also affect the combination of accelerator and blowing agent, as was well known to those skilled in the art. Since the standard for determining the sufficiency of the specifications is geared to persons skilled in the art, and since they would know that the blowing agent has no practical value in a foamed vinyl system without acting in combination with the accelerator, it is clear that they would understand the term "blowing agent", as used in the parent application, to include the combination of blowing agent with the accelerator.

Additionally, while the original applications did not specifically state that the inhibitors can function by attacking the accelerator for the blowing agent, there were several inhibitors of that type disclosed in the original application. We have already noted that an understanding of the mechanism by which the invention functions is not a necessary requisite to patentability. The subsequent addition of the statement that the "blowing agent includes the combination of the blowing agent with the accelerator" did not modify the scope of the application.

There is no question that the inventors named in the continuation-in-part applications were the same as those in the parent application, that the applications upon which the patents in suit were issued were filed before a patent had issued on the parent application, or before its abandonment or termination, and, that the subsequent applications contained specific reference to the parent application. The foregoing discussion has dealt with the identity of invention disclosed in the various applications leading to the eventual issuance of the patents in suit. The inescapable conclusion is that the applications filed more than one year after the initial public sale or use of the invention disclose the same invention which is described in the parent application. Having fulfilled all requirements of title 35 U.S.C. § 120, the disclosures in the '094 and the '108 patents are entitled to the benefit of the filing date of the parent application. Since the parent application was filed within one year of the date that the invention was first in public use or on sale, the statutory bar contained in title 35 U.S.C. § 102(b) has no effect on the validity of the patents in suit.

*Fraud on Patent Office*

Defendant's final challenge to the validity of the patents in suit is that they include subject matter which is not the invention of the patentees named in the patents in suit. 35 U.S.C. § 102(f). Furthermore, the patents should be declared invalid because the oaths which accompanied the applications for the patents in suit were false, thereby perpetrating a fraud on the Patent Office.

The false oath issue arises out of a subsequently filed patent application in the names of Leon Palmer and Leonard Berkan, both employees of plaintiff.

This application, filed February 25, 1965, asserted that Palmer and Berkan were the inventors of a chelating process for embossing vinyl foam products by chelating the metal accelerators, thereby removing them from the system. On September 15, 1965, applications Serial Nos. 487,444 and 487,442 were filed in the names of Nairn, et al., each containing the statement that, "it has been found that certain chelating agents will chelate metal accelerators and thereby remove them from the system". All subsequent Nairn, et al. applications and the patents in suit contain the same statement. The Palmer-Berkan application was subsequently abandoned. From this series of events, defendant claims that in the prosecution of the applications for the patents in suit, plaintiff failed to advise the Patent Office of the concept developed by Palmer-Berkan, or bring the Palmer-Berkan application to the attention of the Patent Office, despite a duty to do so. Additionally, the oaths accompanying the September 15, 1965 Nairn, et al. applications, as well as those subsequently filed, were false in fact by reason of claiming the invention of the chelating mechanism as their own. We find defendant's arguments to be without merit.

The evidence discloses that Palmer and Berkan believed that their identification of the reaction mechanism in terms of the specific chelate formation constant of $1 \times 10^4$, which explained the behavior of the chelators disclosed in the original '738 application of Nairn, et al., was patentable. The Patent Office concluded that inhibitors which functioned as chelating agents were disclosed in the '738 application and that the mere identification of the mechanism by which those inhibitors functioned did not constitute a patentable discovery. Again, we note that a patentee need not fully understand the mechanism by which his invention works before he can have the invention patented. Intermountain Research & Eng. Co. v. Hercules, Inc., *supra;* Electric Storage Battery Co. v. Shemadzer, *supra.* Furthermore, when he does learn the mechanism of the invention, the addition of that explanatory information to his patent application does not constitute an enlargement of the original disclosure. Thus, when the explanation was added to the Nairn, et al. applications that some of the inhibitors specifically listed in the parent application may operate by means of chelation, nothing new or broadening was added to the claimed invention. The invention was still directed toward the broad discovery of a chemical embossing process which utilized an inhibitor in the printing ink. The claims and the invention were not changed by their reference to the specific chelation mechanism, but remained as they were in the parent application, which had, from the beginning, included chelators as inhibitors.

■ Proof of fraud on the Patent Office must be clear, unequivocal and convincing, and a mere preponderance of evidence which leaves the issue in doubt is a wholly insufficient basis for a finding of fraud. Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., 169 F. Supp. 1 (E.D.Pa.1958), aff'd. 268 F.2d 395 (3d Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959). Defendant has fallen far short of the exacting standard for proof of fraud. We find no merit in its position.

*Conclusion*

■ Defendant here has used a shotgun approach to challenge the validity of the patents in suit. However, in spite of the diverse grounds which Armstrong has advanced in support of its claim that the patents should be held invalid, we find that the defendant has failed to meet its burden on any point. We are mindful of the statutory presumption of validity which attaches to a patent which has been regularly issued. 35 U.S.C. § 282. The party seeking to invalidate it, therefore, has the burden of proof. The evidence adduced at trial shows that the patents in suit disclose a meritorious invention which has materially advanced the art of foam vinyl technology. We have no difficulty in hold-

ing U. S. Patents 3,293,094 and 3,293,-108 valid.

II *Infringement*

The patents in suit disclose a process whereby embossing is achieved in a foamed vinyl product by utilizing an inhibitor which substantially alters the temperature at which the blowing agent decomposes. The specific task before the court is to determine whether plaintiff has met its burden of proof to show that the embossing obtained in the defendant's commercial product was achieved by means of an inhibitor which substantially alters the decomposition temperature of the blowing agent. Although the patents each contain several independent claims and numerous dependent claims, it is this one concept which is our prime concern.

Armstrong has been producing and selling a chemically embossed foamed vinyl flooring product since the latter part of 1966. Initially, an explanation of its claimed noninfringing process is necessary in order to be able to compare and contrast it to the process disclosed in the patents in suit. Like the process disclosed in the patents in suit, defendant's process utilizes a plastisol containing a uniformly distributed blowing agent and an accelerator for the blowing agent. In admitted contrast to the plaintiff's process, the defendant's plastisol also includes a uniformly distributed polymerizable monomer, trimethylol propane trimethacrylate. After the plastisol has been applied to a backing, it is heated so as to form a gel with sufficient strength and consistency to have a colored ink pattern printed on its surface. Selected inks contain a polymerization catalyst, namely benzoyl peroxide. The composition is then coated with a clear wear layer and reheated sufficiently to fuse the resin and decompose the blowing agent. Embossing is achieved, according to defendant, because during the final heating step, but before the product reaches the decomposition temperature of the blowing agent, catalytic polymerization of the monomer and cross-linking take place in the foamable layer through the action of the benzoyl peroxide, which itself decomposes. The catalytic polymerization and cross-linking produce a change in the viscoelastic (rheological) properties of the foamable plastisol so that when the blowing agent does reach its decomposition temperature, the ability of the plastisol layer to expand in the areas that have been polymerized and cross-linked is physically restricted. Those areas that have been physically restricted are the depressed areas in defendant's embossed product as compared to the raised areas which have not been restricted. In those areas which are not printed with the polymerization catalyst, the monomer is thermally polymerized, but not cross-linked, at about the temperature of decomposition of the blowing agent. Such thermal polymerization does not restrict foaming. The crucial factor for the defendant in this monomer/peroxide process is that embossing is obtained by physically restricting the foam in selected areas of the printed design. Since embossing is theoretically not obtained by substantially altering the decomposition temperature of the blowing agent in selected areas of the printed design, the process would not infringe the patents in suit.

By virtue of the differential foaming mechanism utilized in the process of the patents in suit, a characteristic of the finished product is a differential in residual blowing agent between the raised and the depressed areas. This characteristic should theoretically not be present in defendant's finished product because the decomposition temperature of the blowing agent is unaffected by the polymerization catalyst. Embossing is claimed to be obtained by physically restricting selected areas of the foam although the blowing agent is uniformly decomposing throughout. However, the results of exhaustive tests, introduced at trial, established that there was a difference in residual blowing agent between the raised and depressed areas of defendant's commercial product.

In its prima facie case, plaintiff noted that there are three factors which affect the amount of blowing agent which decomposes in the foamable composition. The factors are (1) the temperature of the goods being processed, (2) the length of time of heating and (3) the decomposition temperature of the blowing agent. Where the time in the oven for both raised and depressed areas is equal, and the heat is applied as uniformly as possible to the entire gelled sheet, a difference in residual blowing agent between raised and depressed areas indicates that the decomposition temperature of the blowing agent was different in those respective areas.

Defendant countered this argument with what has come to be known as the Hager Theory (advanced by Dr. Nathaniel Hager). According to this theory, the greater decomposition of the blowing agent in the raised area is caused by the internal heat generated by thermal polymerization of the monomer which occurs at approximately the same time that the blowing agent decomposes. On the other hand, the catalytic polymerization of the monomer in the areas printed with a polymerization catalyst occurs at a temperature substantially below the temperature required for blowing agent decomposition, allowing sufficient time for the heat generated by this reaction to be largely distributed throughout the foamable layer prior to the decomposition of the blowing agent. Thus, extra heat is generated by an exotherm which occurs during the decomposition process in the raised area, but no such extra heat is generated during the decomposition process in the depressed area. Therefore, the concept of the Hager Theory is that although heat is uniformly applied to the exterior of the product, the interior of the composition is differentially heated during decomposition of the blowing agent because of differences in internal heat generation. On this basis, defendant argues that the slight difference in residual blowing agent is compatible with its monomer/peroxide restriction theory.

After careful consideration of the evidence before us, however, we must conclude that the difference in residual blowing agent, between the raised and depressed areas of defendant's commercial product cannot be accounted for on the basis of the Hager Theory. The believable evidence indicates that a relatively significant difference in residual blowing agent exists in the defendant's commercial product, while thermal polymerization of the monomer generates a relatively insignificant amount of heat. The two phenomena cannot be reconciled. We must go on then, to determine, first, whether there was a difference in the decomposition temperature of the blowing agent in the raised and depressed areas of the defendant's commercial product. Secondly, we must determine whether any such difference as may exist is sufficient to cause embossing.

The credible evidence produced at trial supports the conclusion that there is a difference in decomposition temperature of at least 3°–5° Fahrenheit between those areas printed with benzoyl peroxide and those areas not so printed. This conclusion, in fact, is corroborated by the results of some of defendant's own tests. In response to any indication that the decomposition temperature of the blowing agent has been altered by the benzoyl peroxide, defendant has repeatedly argued that benzoyl peroxide is not specifically listed as an inhibitor in the specifications of the patents, nor is it a member of any of the listed classes of compounds which have generally been found to make suitable inhibitors. This fact is not disputed. However, it is also true that the benzoyl peroxide decomposes after it is printed on the surface of the gelled plastisol sheet. One of the decomposition products of benzoyl peroxide is benzoic acid, a compound which is specifically listed as an inhibitor in the patent specifications. On the basis of the record before us, we are convinced that the decomposition temperature of the blowing agent in defendant's commercial process is altered by the benzoyl

peroxide, or its decomposition products, in a magnitude of at least 3°–5° F.

In view of the language of the patents which provides that it is generally desired that the difference in decomposition temperature be in the range of at least 20° F. when employing the patented process, the mere showing that there is a difference of at least 3°–5° F. is not sufficient to prove infringement. The crucial language of the specifications of the patents is the requirement that the alteration of the decomposition temperature be substantial. For purposes of determining infringement, a substantial alteration of the decomposition temperature means sufficient alteration to cause enough embossing so that the process may be utilized to enhance the commercial saleability of a product. Convincing proofs have been offered to show that the foam height in the raised and depressed areas of defendant's commercial product can be directly traced to the amount of blowing agent decomposed. These results demonstrated that essentially all of the embossing in defendant's commercial product can be directly attributed to the difference in the amount of decomposed blowing agent in those respective areas. The consequence of this proof of the cause of embossing is to discount defendant's restriction theory as a significant factor.

The record in this matter contains massive documentation and extensive testimony of a highly technical nature. We fully acknowledge the observation of Mr. Justice Frankfurter that the judiciary is most ill-fitted to discharge the technological duties thrust upon it by patent legislation. Marconi Wireless Tel. Co. of America v. United States, 320 U.S. 1, 60, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943). In spite of this we have diligently reviewed the record and thoroughly examined the relevant evidence. It should be noted that the court is aware that there are certain proofs in evidence which arguably detract from our conclusion. This is only natural in an adversary proceeding. However, on the basis of the record before us, we are convinced that the benzoyl peroxide, as used in the defendant's commercial process, is an inhibitor which substantially alters the temperature at which the blowing agent decomposes.

Plaintiff has raised the additional issue that defendant's infringement has been willful and wanton and that they are entitled to treble damages under 35 U.S.C. § 284, and attorneys' fees under 35 U.S.C. § 285. In accordance with our findings of fact, previously noted, we have concluded that the plaintiff has failed to sustain its burden of proof on this issue.

*Conclusion*

On the basis of clear and convincing proof at trial, the court has concluded that benzoyl peroxide, as used in the defendant's commercial process, is an inhibitor which substantially alters the temperature at which at least some of the blowing agent decomposes. This finding comprises a determination of the operative fact upon which the entire issue of infringement rests. It is on this basis that we conclude that defendant, Armstrong Cork Co., has infringed the independent claims numbered 1, 28, 55 and 62 of United States Patent 3,-293,094 and 1 and 25 of United States Patent 3,293,108. Furthermore, on the basis of our findings of fact, we conclude that defendant, Armstrong Cork Co., has infringed the dependent claims numbered 2, 3, 5, 6, 7, 8, 9, 16, 21, 22, 26, 27, 29, 30 and 32 of the '094 patent and 2, 3, 4, 5, 6, 11, 15, 16, 17, 18, 20, 21, 26, 28, 30, 33, 34 and 39 of the '108 patent.

Pursuant to the terms of the Final Pretrial Order in this matter, the determination of the plaintiff's right to an accounting and an injunction will be deferred pending appropriate future proceedings.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this action and the parties to this action. 28 U.S.C. § 1338.

2. The subject matter of the patents in suit was not anticipated by the prior art. 35 U.S.C. § 102.

3. The subject matter of the patents in suit was not obvious to a person skilled in the art at the time the invention was made. 35 U.S.C. § 103.

4. The specifications of the patents in suit contain a written description of the invention in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the invention. 35 U.S.C. § 112.

5. The patents in suit conclude with a statement of claims which particularly point out and distinctly claim the subject matter of the invention claimed therein. 35 U.S.C. § 112.

6. The subject matter of the invention was not in public use or on sale in this country more than one year prior to the date of the filing of the applications for the patents in suit. 35 U.S.C. § 102 (b).

7. Continuation-in-part applications leading to the patents in suit disclosed the same invention disclosed in the parent application, named the same inventors, were filed before the parent application was abandoned, and contain specific reference to the earlier filed applications. 35 U.S.C. § 120.

8. The persons named as inventors in the patents in suit were joint inventors of the subject matter of the invention claimed therein. 35 U.S.C. §§ 101, 102 (f).

9. The invention claimed in the patents in suit disclose a new and useful process which materially advances the prior art. 35 U.S.C. § 101.

10. United States Patents Nos. 3,-293,094 and 3,293,108 are valid.

11. Defendant's commercial process infringes claims 1, 2, 3, 5, 6, 7, 8, 9, 16, 21, 22, 26, 27, 28, 29, 30, 32, 55 and 62 of United States Patent No. 3,293,094.

12. Defendant's commercial products infringe claims 1, 2, 3, 4, 5, 6, 11, 15, 16, 17, 18, 20, 21, 25, 26, 28, 30, 33, 34 and 39 of United States Patent No. 3,293,108.

13. Defendant's infringement has not been willful and wanton.